RICHARD ARJUN KAUL, MD
PROPRIA PERSONA
440 c SOMERSET DRIVE
PEARL RIVER, NY 10965
201 989 2299
drrichardkaul@gmail.com

# 19 CV 3046

## UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

| RICHARD ARJUN KAUL, MD | CIVIL ACTION |
|---|---|
| Plaintiff | |
| | COMPLAINT AND DEMAND FOR JURY TRIAL |
| v. | |
| SENATOR CHARLES E SCHUMER, ALLSTATE INSURANCE COMPANY, GEICO, TD BANK, NA GIBBONS, PC, GANNET CO., INC. | |
| Defendants | |

For reference purposes:
K1: Kaul v Christie: 16-CV-02364
K2: Kaul v Christie: 18-CV-08086



2019 APR -4 PM 1:18
SDNY PRO SE OFFICE
RECEIVED

RICHARD ARJUN KAUL, MD
PROPRIA PERSONA
440 c SOMERSET DRIVE
PEARL RIVER, NY 10965
201 989 2299
drrichardkaul@gmail.com


## UNITED STATES DISTRICT
## COURT FOR THE SOUTHERN
## DISTRICT OF NEW YORK

| RICHARD ARJUN KAUL, MD | CIVIL ACTION |
|---|---|
| Plaintiff | |
| | CERTIFICATION OF PLAINTIFF |
| v. | |
| SENATOR CHARLES E SCHUMER, ALLSTATE INSURANCE COMPANY, GEICO, TD BANK, NA GIBBONS, PC, GANNET CO., INC. | |
| Defendants | |

I, Richard Arjun Kaul, MD, of full age, certifies and says:

I am the Propria Persona Plaintiff

I make this certification in support of the Plaintiff's Complaint

Attached as Exhibit 1 is a true and accurate copy of the following document:

1. Exhibit 1 – E-mail from Robert Conroy, Esq to K2 Defendant Hafner

I certify that the foregoing statements made by me are true to the best of my knowledge. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated: April 4, 2019                    _R.Kaul_ _____

Richard Arjun Kaul, MD

# TABLE OF CONTENTS

I.  PARTIES..........................................................................................................................5

II.  JURISDICTION AND VENUE..................................................................................................6

III.  PRELIMINARY STATEMENT...................................................................................................7

IV.  STATEMENT OF FACT..........................................................................................................9

V.  CLAIMS FOR RELIEF...........................................................................................................10

    A.  COUNT ONE - VIOLATIONS OF 18 U.S.C. COUNT ONE – VIOLATIONS OF 18 U.S.C. § 1962(C) L   (D) THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §1961, *ET SEQ* (Against all Defendants)............................................................10

    B.  COUNT TWO - FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTIONS 16 OF THE CLAYTON ACT FOR DEFENDANTS' VIOLATION OF SECTIONS 1 AND 2 OF THE SHERMAN ACT (Against all Defendants)............................................................................................20

    C.  COUNT THREE - DEPRIVATION OF RIGHT UNDER COLOR OF LAW (Against all Defendants)..........................................................................................................................21

VI.  DEMAND FOR JUDGMENT....................................................................................................24

VII.  DEMAND FOR JURY...........................................................................................................25

VIII.  DEMAND FOR INSURANCE...................................................................................................25

Plaintiff Richard Arjun Kaul, MD ("Kaul") brings this action against Defendants: (1) Senator Charles E. Schumer (**"Schumer"**); (2) Allstate Insurance Company ("**Allstate**"); (3) GEICO ("**GEICO**"); (4) TD Bank, NA ("**TD**"); (5) Gibbons P.C. ("**Gibbons**"); (6) Gannett Co., Inc. ("**Gannett**") to redress Plaintiff's economic and reputational injuries due to the Defendants' illegal scheme to obstruct Kaul's prosecution of the matter of K1. Plaintiff's allegations are based on his own experiences and personal knowledge, his research, publicly available articles, studies, reports and other sources, a reasonable inquiry under the circumstances, and on information and belief. Plaintiff's allegations are likely to have further evidentiary support after a reasonable opportunity for further investigation and discovery.

# I.    PARTIES

1. Plaintiff, RICHARD ARJUN KAUL, MD, is a resident of the State of New York, and is the Plaintiff in the matter of K1. His address is 440 c Somerset Drive, Pearl River, New York 10965.

2. Defendant Senator CHARLES E. SCHUMER is an American politician serving as the senior United States Senator from New York, and is the brother-in-law of United States District Judge, Kevin McNulty. His address is 780 Third Avenue, Suite 2301, New York, New York 10017

3. Defendant ALLSTATE INSURANCE COMPANY is an American corporation traded on the New York Stock Exchange, that is alleged to have, as part of a quid pro quo scheme, funneled bribes to Defendant Schumer and Judge Kevin McNulty, disguised as 'political campaign donations' and 'legal fees'. It's corporate address is Northbrook, Illinois, and it trades on the New York Stock Exchange.

4. Defendant GEICO is an American corporation traded on the New York Stock Exchange, that is alleged to have, as part of a quid pro quo scheme, funneled bribes to Defendant Schumer and Judge Kevin McNulty, disguised as 'political campaign donations' and 'legal fees'. It's corporate address is Chevy Chase, Maryland and it trades on the New York Stock Exchange.

5. Defendant TD BANK, NA, is a Canadian bank, whose American headquarters are in Cherry Hill, New Jersey. It is a company that is publicly traded on the New York Stock Exchange, that is alleged to have, as part of a quid pro quo scheme, funneled bribes to Defendant Schumer and Judge Kevin McNulty, disguised as 'political campaign donations' and legal fees'.

6. Defendant GIBBONS P.C. is an American law firm with offices located in New York, Newark, Trenton, Philadelphia, Wilmington, Washington, DC, West Palm Beach, whose website indicates that **"Gibbons has been selected as the best law firm and as a top three lobbying firm in New Jersey."** Judge McNulty remains a commercial beneficiary of the law firm. It's address is One Pennsylvania Plaza, 37th Floor, New York, New York 10119-3701

7. Defendant GANNETT CO., INC. is an American media conglomerate, that is publicly traded on the New York Stock Exchange, with a portfolio that includes USA today, and K1/K2 defendant North Jersey Media Group, currently known as **"Fourth Edition"**. The corporation is a client of Defendant Gibbons. It's corporate address is Tysons Corner, Virginia.

## II.    JURISDICTION AND VENUE

8.      U.S.C. § 1331 because Plaintiff's claims arise under federal law, and under 18 U.S.C. § 1964(c) because this action alleges violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1337 because this action alleges violations of an Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies. And 15 U.S.C. § 4 and § 16 confer subject matter jurisdiction on this Court over claims brought under the Sherman Act. This Court also has supplemental jurisdiction over the state law claims in this action pursuant to 28 U.S.C. § 1367. This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), (5), because Plaintiff is a citizen of a different state to certain Defendants, the aggregate amount in controversy exceeds seventy-thousand dollars.

9.      Personal Jurisdiction. The Court has personal jurisdiction over each Defendant. Each Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this district. The scheme and conspiracy have been directed at, and have had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including this district. This Court also has personal jurisdiction over all Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would be subject to the jurisdiction of a court of general jurisdiction in New Jersey.

## III.   PRELIMINARY STATEMENT

### Professional Jealousy + Political Corruption

10.     This case is about political and judicial corruption within the American politico-legal establishment, with a central theme that pertains to bribery induced perversions of the course of justice. This case came into being from a series of medical innovations and legal events whose true genesis commenced in approximately 2005/2006. A conflagration of events ignited consequent to Kaul performing the first outpatient minimally invasive spinal fusion in approximately February/March 2005, an event that sparked the medical equivalent of the American Civil War, a fight between neurosurgeons and minimally invasive spine surgeons as to who was qualified to perform these procedures. The Spine Turf Wars, as they came to be known, expanded rapidly, and came to include senior American politicians in both state and federal government, into whose ravenous campaign coffers the neurosurgeons poured their bribes. These monies were part of a series of quid pro quo schemes intended to have the minimally invasive spine surgeons, like Kaul, eliminated from the practice of minimally invasive spine surgery. Like an out-of-control California forest fire, the professional battles began to involve members of the insurance sector, hospital corporations and the outpatient surgical community, in a fight over one of the most economically enhanced sectors of American healthcare.

### Fraud + Obstruction of Justice

11.     From 2005 onwards the STW was litigated in administrative + state + federal courts across the United States, against a backdrop of non-stop media coverage of the events surrounding the illegal suspension/revocation of Kaul's license in 2012/2014. The administrative legal proceedings that resulted in the revocation of Kaul's license were a massive fraud, that the State of New Jersey in conspiracy with the K1/K2 defendants, polluted with hundreds of separate events of perjury + evidential omissions + misrepresentations + tampering + fraud, that Kaul has proved. Kaul argued in 2012 for the appointment of a special prosecutor and ad hoc medical board, as he knew the case against him had been corrupted by the K1/K2 defendants, and that he would not receive substantive justice in New Jersey (**Exhibit 1**). On March 12, 2014 K2 defendant NJBME revoked Kaul's license, based on the fraudulent opinion of K2 defendant/administrative law judge, Jay Howard Solomon. On January 17, 2018 (MLK birthday) Kaul filed 'The Solomon Critique' a document that proves that in the administrative proceeding (April 9, 2013 to June 28, 2013), K1/K2 defendants Przybylski + Kaufman + Solomon collectively committed **two hundred and seventy-eight (278) separate instances of perjury + evidential omissions + misrepresentations + gross mischaracterizations.** On February 11, 2019, Kaul submitted a motion for summary judgment against Defendant

Allstate New Jersey Insurance Company, that over two trillion dollars in damages. On February 25, 2019 Judge McNulty entered an order that dismissed with prejudice Kaul's federal-law claims, and shortly thereafter, Kaul submitted a document entitled 'The McNulty Analysis', that shows the factual and legal inconsistencies Judge McNulty's opinion, in the context of his familial relationship with Defendant Senator Schumer, and that of his status as a commercial beneficiary of Defendant Gibbons PC, a law firm at which Judge McNulty had been the director since at least 2008.

12.     This case makes the assertion/allegation/argument that the K1/K2 defendants bribed Defendant Schumer to use his influence with his brother-in-law, Judge McNulty, in order to obstruct Kaul's prosecution of the case and pervert the course of justice, with the intention of preventing Kaul from presenting to the public the evidence of the K1/K2 defendants' crimes.

13.     The K1/K2/K3 defendants embarked on an ill-intended and ill-conceived illegal scheme in approximately 2006, that will result in their economic + professional + reputational obliteration, and for some will lead to periods of incarceration. The defendants had many opportunities to rectify their wrongdoing, but they chose the true path of the criminal, and continued their cover-up, in the hope that a US Senator and a United States District Judge would salvage their 'Titanic' from 'The Man of Steel', as Kaul was once described by a United States Magistrate Judge. One of the ironies, in all of this, is that on March 28, 2013, as Kaul's lawyer, Robert Levy, was substituting out of the administrative case, he stated to Kaul's incoming lawyer, Charles Shaw:

**"Good luck, this is a sinking ship"**

14.     Little did Levy know, that K2 defendants, Solomon + Hafner would end-up at the bow of that ship.

8

## IV.   STATEMENT OF FACT

15.    The facts underpinning the four (4) themes (Professional Jealousy + Political Corruption + Fraud + Obstruction of Justice) of this case have been detailed in K1, and can be found within the following submitted documents:

a.    'The Solomon Critique': D.E. 225 Page ID 5271 to 5270

b.    Motion for Summary Judgment v. Allstate New Jersey Insurance Company: D.E. 299 Page ID 7017 to 8170.

c.    Opinion of Judge McNulty: D.E. 300 Page ID 8171 to 8217

d.    'The McNulty Analysis': D.E. 313 Page ID 8381 to 8448.

# V.   CLAIMS FOR RELIEF

## COUNT ONE

### VIOLATIONS OF 18 U.S.C. COUNT ONE – VIOLATIONS OF 18 U.S.C. § 1962(C) - (D) THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §1961, *ET SEQ* (Against all Defendants)

16.     Plaintiff incorporates by reference each preceding paragraph as thought fully set forth herein.

17.     Plaintiff brings this Count against Defendants Schumer + Allstate + Geico + TD + Gibbons + Gannett (inclusively, for the purpose of this count, the "SCHUMER RICO Defendants"). At all relevant times, in a period from in or around July 2016 to the present, each of the SCHUMER RICO Defendants has been a "person" pursuant to 18 U.S.C. § 1961(3), because each is capable of holding and does hold, "a legal or beneficiary interest in property." Section 1962© makes it "unlawful for any person employed by unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." See 18 U.S.C. § 1962(c).

18.     Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions. See 18 U.S.C. § 1962(d).

19.     As explained in detail below, the SCHUMER RICO Defendants obstructed the process of justice in the matter of K1, in order to pervert the course of justice and cause Judge Kevin McNulty of the United States District Court for the District of New Jersey, to deny Kaul his constitutionally protected right to due process, deny him discovery, deny all of his motions and violate his civil rights, by denying him access to the procedure and substance of justice.

20.     The purpose of the SCHUMER RICO Defendants fraudulent scheme was to cause Kaul to cease his prosecution of K1, in order to cause a concealment of their criminal conduct, as is alleged in K1. The purpose of this concealment was to negate the incurrence of the economic and reputational damages, that would have ensued from Kaul's public prosecution of the case.

## A. Description of the SCHUMER RICO Enterprise

21.     RICO defines an enterprise as "any individual, partnership, corporation, association, or

other legal entity, and any union or group of individuals associated-in-fact although not a legal entity." 18 U.S.C. § 1961 (4). An association-in-fact enterprise requires three structural features: (1) a purpose; (2) relationship among those associated with the enterprise; and (3) longevity sufficient to permit those associates to pursue the enterprise's purpose.

22.     The "**purpose**" of the SCHUMER RICO Enterprise is stated in ---.

23.     The "relationships" between the SCHUMER RICO Defendants, in the context of the SCHUMER RICO Association-In-Fact Enterprise are detailed below in ¶ to ¶.

24.     Defendant Allstate commenced its scheme of bribing Defendant Schumer in approximately 1998, in a series of quid pro quo schemes, the purpose of which was to facilitate the entry of legislation advantageous to its commercial agenda, that permitted it to arbitrarily raise its auto insurance premiums. These bribes have been disguised as 'political campaign' donations, and include monies deposited in off-shore banking accounts and trusts. Defendant Allstate has, for at least the last twenty-two (22) years, employed this particular strategy in bribing state/federal legislators/politicians/judges. This pattern continues to this day and is an "open-ended" pattern of racketeering continuity, that poses an ongoing threat.

25.     Defendant Geico has the same relationship with Defendant Schumer, as does Defendant Allstate. Defendant Geico, like Defendant Allstate, profits from the sale of auto insurance policies in, amongst others, the states of New Jersey and New York. Both defendants Geico and Allstate are companies publicly traded on the New York Stock Exchange, share identical economic goals and strategies of commerce, an element of which includes the bribing of state/federal politicians/legislators/judges, in furtherance of their economic agendas. Defendant Schumer's political career has been built primarily on monies (bribes) derived from NYSE traded companies, that include defendants Allstate + Geico + TD + Gannett.

26.     Defendants Allstate + Geico + TD have, since at least 2006, engaged in commerce with Defendants Gannet + Gibbons, in the procurement of advertising and media coverage, advantageous to their commercial agendas. The quid pro quo in these commercial arrangements involves the funneling of monies from defendants Allstate + Geico + TD to defendants Gannet and Gibbons, in return respectively for favorable media coverage, and the effective 'purchasing' of Judge Kevin McNulty, made possible by his remaining a commercial beneficiary of Defendant Gibbons, subsequent to his appointment to the federal bench in 2012.

    27. Judge McNulty is the brother-in-law of Defendant Schumer.

28.     Defendant Schumer has received monies (bribes) disguised as 'political campaign donations' from Defendant Gibbons, a law firm of which Judge McNulty was the director in a period from approximately 2006 to 2012.

29.     Defendant Schumer, although the US Senator for New York, used his political influence with now deceased US Senator for New Jersey, Frank Lautenberg, to have Judge McNulty appointed to the federal bench in 2012.

30.     Defendant TD has the same relationship with Defendant Schumer as do defendants Geico + Allstate.

31.     All of the defendants were and continue to be engaged in commerce, and became an association-in-fact enterprise pursuant to RICO, in or around mid 2016, the purpose of which was to obstruct justice in K1, and pervert the course of justice in order that Kaul cease his prosecution of the case.

32.     The defendants relationships commenced in at least 1998 and constitute an "**open-ended**" pattern of racketeering continuity, a consequence of which has been to obstruct Kaul's prosecution of K1. This "**pattern of racketeering**" has involved the flow of bribes from defendants Allstate + Geico + TD + Gannet through defendants Gibbons + Schumer, with whom Judge McNulty remains in-privity. This has been the typical pattern of public corruption, employed by the defendants, one that has involved the conversion of law firms, courts and the body politic into racketeering enterprises, through which quid pro quo schemes are orchestrated between public servants and private entities. These schemes are ongoing and possess the requisite longevity, pursuant to RICO, to achieve the purposes of the enterprise i.e. deny Kaul access to justice in order to provide 'cover' for the defendants' crimes as alleged in K1 + K2.

33.     The defendants, in furtherance of their racketeering scheme, engaged in communications that commenced in or around mid 2016, and involved face to face meetings, e-mails and texts, the substance of which pertained to the scheme to obstruct Kaul's access to justice, by using the SCHUMER RICO Enterprise to influence Judge McNulty to pervert the course of justice, prevent Kaul from obtaining discovery, and then to dismiss the case with prejudice, when Kaul moved for summary judgment against Defendant Allstate New Jersey Insurance Company.

34.     At all relevant times, in the period that commenced in or around mid 2016, the SCHUMER RICO Defendants operated an ongoing association-in-fact enterprise, manufactured

for the purpose of obstructing Kaul's prosecution of K1, and perverting the course of justice, while committing the crime of Honest Service Fraud, through bribery, kickbacks and self-dealing. The nexus that permitted the flow of bribes and the perpetration of the quid pro quo schemes from and between defendants Gannet + Allstate + Geico + TD and defendants Schumer + Gibbons, was hinged on the law firm of defendant Gibbons and the political and personal accounts/trusts of Defendant Schumer.

35.     The defendants perpetrated these schemes with in-person meetings that commenced in or around mid 2016, in closed door settings in New York, New Jersey and Washington, D.C., and in doing so conducted a pattern of racketeering under § 18 U.S.C. 1961(4).

36.     The defendants, in the knowledge that their activities constituted violations of RICO, configured the SCHUMER RICO association-in-fact enterprise in such a way as to provide 'cover' for their illicit scheme, and used their separate legal statuses to internally organize the SCHUMER RICO association-in-fact enterprise, to mitigate the vicarious liability of RICO. The defendants conspired in the construction of this fraudulent racketeering construct, because they believed their distinct legal statuses would hinder detection, and make opaque the true internal architecture of their criminal syndicate.

37.     At all times from approximately 2016, the SCHUMNER RICO Enterprise constituted a single "enterprise" or multiple enterprises within the meaning of 18 U.S.C. § 1961(4), as legal entities, as well as individuals and legal entities associated-in-fact for the common purpose of engaging in the SCHUMER RICO Defendants fraudulent scheme to obstruct Kaul's prosecution of K1.

38.     The SCHUMER RICO association-in-fact Enterprise consisted of the following entities and individuals: (a) Defendant Schumer; (b) Defendant Allstate; (c) Defendant Geico; (d) Defendant TD; (e) Gibbons; (f) Gannett.

39.     While each of the SCHUMER RICO Defendants acquired, maintained control of, were associated with, and conducted or participated in the conduct of the SCHUMER RICO Enterprise's affairs, at all relevant times, the CAC RICO Enterprise: (a) had an existence separate and distinct from each CAC RICO Defendant; (b) was separate and distinct from the pattern of racketeering in which the CAC RICO Defendants engaged; and (c) was an ongoing and continuing organization consisting of legal entities, including the CAC RICO Defendants, along with other individuals and entities, including unknown third parties.

40.     The SCHUMER RICO Defendants and their co-conspirators, through their illegal

SCHUMER RICO Enterprise, engaged in a pattern of racketeering activity, which involved a fraudulent scheme to obstruct Kaul's prosecution of K1 and pervert the course of justice, the purpose and result of which was respectively protection from economic obliteration and economic enrichment.

41.     Defendant Schumer orchestrated the SCHUMER RICO Scheme, whereby he leveraged his familial relationship with Judge Kevin McNulty to obstruct Kaul's prosecution of the case, cause the illegal dismissal of K1, and prevent the public exposure of the judicial/political corruption in the case. Defendant Schumer was motivated to engage in this scheme because of money, as was Judge McNulty, who facilitated the scheme with a chilling indifference to the interests of justice.

42.     The SCHUMER RICO Enterprise facilitated its fraudulent scheme of obstruction of justice + mail fraud + wire fraud + bribery + honest services fraud through a federal court, federal personnel and through entities connected to the political office of Defendant Schumer. The overarching purpose of the SCHUMER RICO Enterprise was to obstruct Kaul's prosecution of the case, pervert the course of justice and cause Judge Kevin McNulty to illegally dismiss the case, this being the 'quid' and the bribes being the 'pro'. These events commenced in mid 2016 and continued to the dismissal of the case in February, 2019. Defendants Allstate + Geico + TD + Gannett periodically funneled bribes into the campaign coffers of defendant Schumer, the accounts of Defendant Gibbons (bribes disguised as 'legal fees'), and made the payments in instalments to ensure Judge McNulty continued his obstruction of Kaul's case to dismissal.

**B.     The SCHUMER RICO Association-In-Fact Enterprise engaged in an "open-ended" continuity "pattern of racketeering" in which they converted a federal court and political party into a RICO enterprise, the sole purpose of which was to obstruct justice, through the commission of bribery + mail fraud + wire fraud.**

43.     All of the defendants became commercially enriched from their involvement in the SCHUMER RICO Enterprise and its fraudulent scheme of bribery + mail fraud + wire fraud + obstruction of justice. The illegal dismissal of Kaul's case was a "**racketeering injury**" that was a consequence of the defendants covert conversion of a federal court and political agency into an association-in-fact RICO enterprise. This enterprise provided legitimate 'cover' for the commission of multiple quid pro quo schemes, in which bribes were funneled from defendants Allstate + Geico + TD + Gannet to and through defendants Gibbons + Schumer.

44.     At all times from approximately 2016, the SCHUMER RICO Association-In-Fact Enterprise: (a) had an existence separate and distinct from each SCHUMER RICO Defendant; (b)

14

was separate and distinct from the pattern of racketeering in which the SCHUMER RICO Defendants engaged; and (c) was an ongoing and continuing organization consisting of legal entities, including the SCHUMER RICO Defendants, along with other individuals and entities, including unknown third parties that operated an association-in-fact enterprise, which was formed for the purpose of obstructing Kaul's prosecution of the case, perverting the course of justice and causing the illegal dismissal of K1.

45.     Defendants Allstate + Geico have a long and well-developed pattern of judicial/political corruption, that has been conducted through public relations firms, law firms and political lobbyists, with a 'revolving door' that connects the judiciary and body politic to these publicly held NYSE traded corporations.

46.     The SCHUMER RICO Enterprise engaged in, and its activities affected, interstate and foreign commerce because it involved commercial activities across state boundaries. These activities included the sale of financial services + products + the trans-national commercialization of risk.

47.     Within the SCHUMER RICO Enterprise, there existed a communication network, through which the defendants and co-conspirators disseminated information relevant to the perpetration of their fraudulent racketeering schemes, the purpose of which was to obstruct Kaul's prosecution of K1, pervert the course of justice and cause the illegal  dismissal of K1. It was through this this network that the defendants coordinated their quid pro quo schemes.

48.     Each defendant in the SCHUMER RICO Enterprise had systematic linkages to each other through familial ties, corporate ties, contractual relationships and a continuing coordination of activities. Through the SCHUMER RICO Association-In-Fact Enterprise, the SCHUMER RICO Defendants functioned as a continuing unit with the purpose of furthering the SCHUMER RICO Scheme. The SCHUMER RICO Defendants participated in the operation and management of the SCHUMER RICO Association-In-Fact Enterprise by directing its affairs, as described herein. While the SCHUMER RICO Defendants participated in, and are members of the enterprise, they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

49.     The SCHUMER RICO Defendants exerted substantial control over the SCHUMER RICO Enterprise, and participated in the affairs of the enterprise by: (a) deciding how and when bribes were dispersed; (b) communicating directly with lawyers, public relation agents and political lobbyists with direct connections to defendant Schumer and Judge McNulty; (c)

15

ensuring that the unnamed co-conspirators complied with and concealed the fraudulent scheme.

50.     Without each SCHUMER RICO Defendants' willing participation, the SCHUMER RICO Scheme and common course of conduct would not have been successful. The SCHUMER RICO Defendants directed and controlled the ongoing enterprise necessary to implement the scheme. These meetings commenced in mid 2016 and continued into 2019 and consisted of discussions regarding the coordination of bribery with the progression of the case, to ensure that Judge McNulty continued to obstruct Kaul's prosecution of the case, quash subpoenas, deny discovery, deny Kaul's motions and pervert the course of justice to ensure Judge McNulty dismissed K1 with prejudice. A part of the defendants strategy was to encourage the Court provide Kaul with the charade of due process, in order to attempt to make the Court's dismissal appellate proof, in much the same deceptive manner that K2 defendants Hafner + Solomon conducted the charade of the administrative board proceedings that caused the illegal revocation of Kaul's license on March 12, 2014. Kaul has been subject to seven years of gross and criminally minded injustice in administrative + state + federal courts, within the geographic boundaries of New Jersey, which is one of the reasons why this case must and will be litigated in the SDNY.

**C.      Predicate Acts: Mail Fraud (Section 1341) + Wire Fraud (Section 1343) + Bribery (Section 201) + Obstruction of Justice (Section 1503)**

51.     To carry out, or attempt to carry out, the scheme to defraud, the SCHUMER RICO Defendants, each of whom is a person associated-in-fact with the SCHUMER RICO Enterprise, did knowingly conduct or participate, directly or indirectly, in the affairs of the SCHUMER RICO Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud), engaged in bribery in violation of 18 U.S.C. §201, and obstruction of justice in violation of 18 U.S.C. §§ 1501-1521. The SCHUMER RICO Defendants have committed, conspired to commit, and/or aided and abetted in the commission of at least two predicate acts of racketeering activity (i.e. violations of 18 U.S.C. §§ 1341 and 1343 + 18 U.S. C. §201 + 18 U.S.C. §§ 1501-1521) within the past ten years.

52.     The multiple acts of racketeering activity which the SCHUMER RICO Defendants committed, or aided and abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a **"pattern of racketeering activity**." The racketeering activity was made possible by the

SCHUMER RICO Defendants' regular use of the facilities, services, distribution channels, and employees of the SCHUMER RICO Enterprise. The SCHUMER RICO Defendants participated in the scheme to obstruct Kaul's prosecution of K1 by using mail, telephone, and the Internet to transmit mailing and wires in interstate or foreign commerce.

53.     The CAC RICO Defendants used, directed the use of, and/or caused to be used the mail and wire communications in furtherance of their illegal scheme to obstruct Kaul's prosecution of K1, by colluding with Judge McNulty to deny Kaul discovery, deny his motions, delay his case in order to permit defendants and third-party witness the opportunity to delete and or cause the spoliation of evidence.

54.     In devising and executing the illegal scheme, the SCHUMER RICO Defendants concocted and knowingly carried out a material scheme and/or artifice that deprived the Plaintiff of his constitutionally protected right to substantive due process. For the purpose of executing the illegal scheme, the SCHUMER RICO Defendants committed these racketeering acts intentionally and knowingly with the specific intent to obstruct Kaul's prosecution of K1, deny him discovery, deny his motions and illegally dismiss K1, with the expectation that it would exhaust his resources, frustrate his will and cause him to "**pack his bags and leave**". They are wrong on all counts.

55. The CAC RICO Defendants' predicate acts of racketeering (18 U.S.C. § 1961(1) include, but are not limited to:

(a) Mail Fraud: The SCHUMER RICO Defendants violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to revoke the Plaintiff's medical license by means of misrepresentations and omissions.

(b) Wire Fraud: The SCHUMER RICO Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to defraud and obtain money on false pretenses, misrepresentations, promises, and omissions.

(c) Bribery: The SCHUMER RICO Defendants violated 18 U.S.C. §201 by bribing Defendant Schumer and causing him to violate sections (b)(2)(A)(B)(C), while themselves violating sections (b)(1)(A)(B)(C)

(d) Obstruction of Justice: The SCHUMER RICO Defendants violated 18 U.S.C. §§1501-1521 by conspiring and colluding with Defendant Schumer Judge

McNulty to obstruct Kaul's prosecution of K1, through the interference and influence of a pending federal judicial proceeding, of which the defendants had knowledge and of which they possessed a corrupt intent to interfere with or attempt to interfere with the proceeding. This evidence of this corrupt intent will be evident in the defendants digital and hand-written notes, those of third-party witnesses and the metadata of their digital profiles, the content of which can be reconstituted into arabaic format.

56.     The SCHUMER RICO Defendants' use of the mails and wires include, but are not limited to: (a) the transmission of letters, e-mails and other materials purposed to obstruct Kaul's prosecution of K1; (b) the transmission of letters, emails and other materials indicating that the SCHUMER RICO Defendants had instructed their co-conspirators not to cease all communications with Kaul and not provide third-party affidavits; (c) written, telephone, or electronic communications regarding the bribery and obstruction of justice; (d) written, telephone, or electronic communications regarding discussions between the SCHUMER RICO Defendants and state and federal politicians about the scheme to have K1 dismissed and deny Kaul due process.

57.     The SCHUMER RICO Defendants also communicated with each other, by U.S. mail, interstate facsimile, and interstate electronic mail in furtherance of their scheme to obstruct Kaul's prosecution of K1, and to cause its dismissal with prejudice on February 22, 2019. These communications occurred in a period that commenced in or around mid 2016, and were initiated by defendants Allstate + Geico, who through their political lobbyists + lawyers + public relation consultants contacted agents/representatives of Defendant Schumer. These initial communications were made in an 'arms-length' manner, but as the scheme progressed there did occur direct communications between the defendants. These direct communications occurred principally in the senate buildings in Washington, DC.

58.     The SCHUMER RICO Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. In Violation of 18 U.S.C. § 1962(d), the SCHUMER RICO Defendants conspired to violate 18 U.S.C. § 1962(c), as described herein. Various other persons, firms, and corporations, including third-party entities and individuals not named as defendants in this Complaint, have participated as co-conspirators with the CAC RICO Defendants in these offenses. They have performed acts in furtherance of the defendants' illegal scheme to obstruct Kaul's prosecution of K1. The SCHUMER RICO Defendants aided and abetted others in violation of the above laws.

59.     To achieve their common goals, the SCHUMER RICO Defendants encouraged Judge

McNulty to deny Kaul discovery and deny his motions, in order to obstruct his prosecution of the case, and cause it to be dismissed with prejudice on February 22, 2019.

60.     The SCHUMER RICO Defendants and each member of the conspiracy, with knowledge and intent, agreed to the overall objective of the conspiracy to obstruct Kaul's prosecution of K1. The defendants agreed to conceal the details, and limit their discussions of the scheme to communications with each other, their lawyers + public relation consultants + political lobbyists. However, information pertaining to the scheme was brought to Kaul's attention by third-party witnesses who belong to the New Jersey political/medical/legal communities.

61.     The SCHUMER RICO Defendants engaged in a pattern of related and continuous predicate acts against the Plaintiff for three years. The predicated acts constituted a variety of unlawful activities, each conducted with the common purpose of obstructing Kaul's prosecution of K1. The predicate acts were related and not isolated events.

62.     During the SCHUMER RICO Defendants' perpetration of their scheme, Kaul had multiple communications with third-party witnesses in or around January 2019, in which he was provided with information as to the fact that the scheme was initiated by defendant Allstate + Geico, who through their lawyers + political lobbyists + public relation consultants presented defendant Schumer with the promise of bribes, disguised as 'political donations', and the transfer of monies into off-shore accounts/trusts and certain 'charitable foundations', including that of the Clinton Foundation.

63.     By reason of, and as a result of the misconduct of the SCHUMER RICO Defendants, and in particular, their pattern of racketeering activity, Kaul's prosecution of K1 has been obstructed, he has been denied discovery, his motions have been denied, and his case was dismissed with prejudice on February 22, 2019.

64.     The SCHUMER RICO Defendants' violations of 18 U.S.C. §1962(c) and (d) have directly and proximately caused injuries and damage to Kaul, who is entitled to bring this action for three times its actual damage, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c)

**COUNT TWO**

**FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTIONS 16 OF THE CLAYTON ACT FOR DEFENDANTS' VIOLATION OF SECTIONS 1 AND 2 OF THE SHERMAN ACT (Against all Defendants)**

65.      The events, facts and circumstances that caused Kaul to file K1, and as pled in K1, were also responsible for wide-ranging ant-trust effects on the minimally invasive spine surgery market in America, one consequence of which was an increase in the abuse of opiate based medications, due to an artificial reduction in the availability of minimally invasive spine surgery. Kaul asserts that the prosecution of K1 would have exposed these anti-trust violations, and the unconstitutional configuration of the mechanism of physician regulation, and would have resulted in fundamental regulatory changes, that would have benefitted the public. The defendants illegal scheme to obstruct Kaul's prosecution of K1, has deprived the public of these benefits, and has furthered the anti-trust injuries alleged in K1.

66.      There is no evidence to prove that the current system of physician regulation in the United States of America protects the public, but there does exist evidence to prove that many state medical boards operate in violation of the due process clauses of the United States Constitution. The medical boards/tribunals operate without oversight, frequently merge the functions of judge + jury + prosecutor, and often initiate actions against physicians for reasons of politics + economics + professional jealousy, reasons that are concealed from the public.

67.      The illegality of these state administered systems would have been publicly exposed had Kaul been permitted to prosecute K1, and the SCHUMER RICO Defendants' obstruction of the case has perpetuated the existence of these illegal schemes, and their anti-trust injuries on the healthcare of the American public.

68.      The SCHUMER RICO Defendants anti-competitive scheme, rooted in its obstruction of justice, violates both the Sherman + Clayton Acts. The SCHUMER RICO Defendants knew that their illegal scheme would cause further anti-competitive injuries to the minimally invasive spine surgery market in the America, but acted with reckless disregard and or willful ignorance as to the injuries that their misconduct would cause to the public.

69.      The SCHUMER RICO Defendants , as part of their monopolistic scheme, a scheme rooted in the obstruction of Kaul's prosecution of K1, conspired to maintain monopoly power for themselves and their K1 co-conspirators and bribers, with regards to the minimally invasive spine surgery market in the United States. This was in violation of Section 2 of the Sherman Act.

70.    The SCHUMER RICO Defendants obstruction of Kaul's prosecution of K1, has facilitated and furthered a monopolization of the minimally invasive spine surgery in America by the K1 defendants, that would not have occurred absent their obstruction of justice. This has caused further anti-trust injury to Kaul and similarly trained minimally invasive spine surgeons in the United States, and has further deprived the public of the benefits of competition, in violation of Section 1 of the Sherman Act.

71.    Kaul's reputation and economic standing were furthered injured by the defendants anti-trust violations, which have continued to deprive Kaul of his ability to practice minimally invasive spine surgery. Such an injury of "exclusion", one that would have been rectified, but for the defendants obstruction of Kaul's prosecution of K1, is the type antitrust laws were designed to prevent, and which is a direct consequence of the defendants unlawful obstruction of justice.

72.    Kaul continues to suffer and will continue to suffer in the future from being excluded from the minimally invasive spine surgery market, more than he would have absent the defendants anti-competitive obstruction of justice. If Kaul has been permitted to prosecute K1, the progression of these anti-competitive injuries would have been partially mitigated.

73.    Defendants' anti-competitive obstruction of justice, pursued in the context of bribery, kickbacks and fraud is not entitled to Noeer-Pennington immunity.

74.    Kaul, pursuant to Fed. R. Civ. P. 57 and U.S.C. § 2201(a) hereby seeks a declaratory judgment that Defendants' conduct in the obstruction of Kaul's prosecution of K1, has prevented Kaul's competition in the minimally invasive spine surgery market, in violation of Sections 1 and 2 of the Sherman Act

## COUNT THREE

### DEPRIVATION OF RIGHT UNDER COLOR OF LAW (Against all Defendants)

75.    Plaintiff hereby repeats and incorporates by reference each and every one of the foregoing paragraphs as though fully set forth.

76.    The defendants acted under color of state law, in depriving Kaul of his civil rights and constitutionally protected right to due process pursuant to the Fifth + Eight +

Fourteenth Amendments of the United States Constitution.

77.     From the commencement of the case on February 22, 2016, the defendants and or their counsel/agents became intertwined with the counsel/agents of defendants related to Defendant State of New Jersey. These entities included: (i) CHRISTOPHER J. CHRISTIE; (ii) THE STATE OF NEW JERSEY; (iii) JEFFREY CHIESA, ESQ; (iv) STEVEN LOMAZOW; (v) GREGORY PRZYBYLSKI, MD; (vi) NEW JERSEY BOARD OF MEDICAL EXAMINERS; (vii) WILLIAM ROEDER.

78.     There existed a sufficiently close nexus between the state/state actors, and the defendants, in that the political and economic motives were almost identical. The defendants, in the knowledge that Kaul's prosecution of K1 would expose the crimes committed by the state during the administrative board proceedings (April 9, 2013 to June 28, 2013), acted to obstruct the prosecution, cause Kaul to be denied discovery and cause the Court to deny all of Kaul's motions.

79.     The State created the legal framework from which defendants Allstate + Geico exercised the power of the State to have Kaul's license revoked, in order to negate their financial obligations to Kaul. All of the defendants, except Defendant Schumer, made 'political donations' to CHRISTOPHER J. CHRISTIE, in a period from 2009 to 2016.

80.     Subsequent to the first case management conference in May 2016, the Court configured the case in order to procedurally align the interests of the state and non-state defendants, in the knowledge that the events + facts + circumstances that caused Kaul to file K1, evidenced that there already existed a merger of public and private function between the State and non-state defendants. Defendant Christie had converted the state into a racketeering enterprise, in which he sold state functions/authority/information to defendants Allstate + Geico + TD + Gibbons + Gannett, in return for bribes disguised as 'political campaign donations'.

81.     These defendants adopted the mantle of state authority, that they used in K1 to perpetuate the deprivation of Kaul's right to due process, a deprivation that commenced on April 2, 2012, and first became evident on My 22, 2012, when the acting director of the division of consumer affairs, Eric Kanefsky illegally suspended Kaul's CDS prescribing privileges. This pattern of due process violation next became evident on June 13, 2012 when K2 defendant NJBME illegally suspended Kaul's license, quashed witness subpoenas for Kanefksy + Attorney General, Jeffrey Chiesa, and the president of K2 defendant NJBME, Paul Jordan, MD. This pattern has continued for seven (7) years in

administrative + state + federal courts within the geographic boundaries of New Jersey.

82.    The defendants scheme to obstruct Kaul's prosecution of K1 has been made under the color of and in conspiracy with state actors, who were defendants in K1, but all of whom, however, were dismissed with prejudice on June 30, 2017 (D. E. 200) by Judge Kevin McNulty. This was a calculated tactic designed to dampen the political corruption thrust of K1. Defendant Schumer, as with K1 defendant Christie, has for many years used the power of his political office in furtherance of schemes that enriched himself, his family and friends.

83.    The defendants scheme to deprive Kaul of his right to due process and obstruct his prosecution of K1 was and is an intentional and highly coordinated scheme, that involved collusion and conspiracy between state actors/agencies and the defendants. Defendant Gibbons receives legal work from the state, and a percentage of these profits are directed to Judge Kevin McNulty. This is an illegal arrangement that violates the doctrine that underpins the fundamental separation of powers, a doctrine on which this country was founded.

84.    The defendants knew that their scheme to deprive Kaul of his right to due process was illegal, but calculated that Kaul would never be able to expose their scheme.

85.    The defendants illegal scheme to obstruct Kaul's prosecution of K1 has perpetuated the economic and reputational damages that commenced on April 2, 2012 and has caused further damage to these attributes and to Kaul's professional standing. The economic damages are detailed in the Original Complaint (D.E. 1-2 Page ID 198 to 200).

86.    The defendants, in obstructing Kaul's prosecution of K1 and depriving him of his constitutionally protected right to due process, have conspired with each other and with actors/agents of the State of New Jersey. These state actors are motivated to want to suppress K1, in the knowledge that it will expose the crimes committed against Kaul during the administrative board proceedings that resulted in the illegal revocation of Kaul's license (April 9, 2013 to June 28, 2013). The politico-legal nexus that exists between the state and the administrative + state + federal courts within the geographic boundaries of New Jersey, has been used by the defendants to obstruct Kaul's prosecution of K1.

87.    Kaul filed K1 on February 22, 2016 in the United States District Court for the

23

Southern District of New York. On April 3, 2019, Kaul's efforts at obtaining discovery have continued to be denied. This lack of "**substantive**" justice is exactly what Kaul predicted would occur (Kaul v Christie: United States Court of Appeals for the Second Circuit – 16-1397 -CV D.E. 41 Page 1 to 170). This is illegal, and is partly a consequence of the defendants deprivation, under color of state law, of Kaul's right to due process, a deprivation that was implemented in furtherance of the conspiracy that officially commenced on April 2, 2012.

## VI.    DEMAND FOR JUDGMENT

**WHEREFORE,** Plaintiff seeks judgment against the Defendants jointly and severally, as follows:

88.    Compensatory damages from all defendants in their individual capacities.

89.    Consequential damages from all defendants in their individual capacities.

90.    Punitive damages from all defendants in their individual capacities.

91.    Declaring that the defendants funneled bribes to Judge Kevin McNulty and Defendant Schumer through the law firm of Defendant Gibbons, and the political campaign funds of Defendant Schumer.

92.    Declaring that the bribes were part of a quid pro quo scheme, the purpose of which was to obstruct Kaul's prosecution of K1.

93.    Declaring that the conduct alleged herein is in violation of Sections 1 and 2 of the Sherman Act and of the other statutes set forth above.

94.    Enjoining defendants from continuing the illegal activities alleged herein.

95.    Granting Kaul equitable relief in the nature of disgorgement, restitution and the creation of a constructive trust to remedy defendants' unjust enrichment

96.    Awarding Kaul treble, multiple, punitive and/or other damages in the amount

to be determined at trial or through settlement.

97.    Awarding Kaul costs of suit, including reasonable attorneys' fees as provided by law.

98.    Granting such other relief as is necessary to correct for the anti-competitive effects caused by the unlawful conduct of defendants, and as the Court deems just.


## VII.   JURY DEMAND

Kaul demands trial by jury on all issues so triable


## VIII.   DEMAND FOR INSURANCE

Demand is hereby made for all insurance policies, which may cover the damages alleged in this Complaint

# Exhibit 1

## Richard Kaul

**From:** Robert Conroy [RConroy@drlaw.com]
**Sent:** Tuesday, May 22, 2012 4:31 PM
**To:** Richard Kaul
**Subject:** FW: I/M/O Richard Kaul, M.D.

**From:** Robert Conroy
**Sent:** Tuesday, May 22, 2012 3:40 PM
**To:** 'Doreen Hafner' (Doreen.Hafner@dol.lps.state.nj.us)
**Subject:** I/M/O Richard Kaul, M.D.

Please share this email with the powers that be.

I am not accusing you of bad faith but I believe that the Attorney General and the Acting Director of the Division of Consumer Affairs have not only acted in extreme bad faith in seeking to summarily suspend my client's CDS privileges but that have done so as part of a cheap piece of political theater and have made a mockery of my client's Due Process Rights. We believe their actions to have so prejudiced the administrative process that Dr. Kaul is unable to obtain a fair hearing. I have raised the improper merger of the investigatory, prosecutorial and adjudicatory functions in the Office of Attorney General before as a clearly unconstitutional practice. Apparently, this will give us the factual basis to establish once and for all that the Office of Attorney General cannot be trusted to conduct itself fairly and within the confines of the Constitution. Insofar as the Attorney General and the Acting Director of the Division of Consumer Affairs have made statements to the media that clearly reveal their personal animus toward my client and their pre-judgment of this matter, we call upon them to immediately recuse themselves from any and all future deliberations, etc., involving Dr. Kaul, and make themselves available to testify as required by a subpoena I will be issuing to compel their attendance at the hearing on this latest summary suspension. I must also warn them about engaging in any efforts to obstruct our client's attempt to receive a fair hearing or cover up their previous involvement. Lastly, we are presently considering federal action. Might I remind the powers that be that we have been successful in the past in obtaining a sizeable attorneys' fee award against the state in a Board matter; indeed, we are the only party in the history of our Republic to ever have the US Marshall seize a state's general revenue fund. Apparently, they want to afford us another opportunity to do so.

If cooler heads prevail, please have them contact me. Otherwise, I can assure them that this will ultimately not be judged their finest hour.

**Robert J. (Bob) Conroy**
Kern Augustine
Conroy & Schoppmann, P.C.
1120 Route 22 East
Bridgewater, NJ 08807
tel: 908-704-8585
fax: 908-704-8899
email: conroy@drlaw.com or robertjconroy@post.harvard.edu
Admitted to practice law in: New York, New Jersey, California, Florida, Pennsylvania and the District of Columbia

6/16/2012